E. G. WENHOLD, Plaintiff,

v.

ROYAL INSURANCE COMPANY,
Limited, Defendant.

Civ. A. No. 59–818–J.

United States District Court
D. Massachusetts.

Sept. 2, 1961.

Henry M. Leen, Maguire, Roche & Leen, Boston, Mass., Thomas J. Carens, Boston, Mass., for plaintiff.

William T. Conlan, Ely, Bartlett, Brown & Proctor, Boston, Mass., for defendant.

JULIAN, District Judge.

The plaintiff brings this action to recover on a policy of insurance issued by the defendant to the plaintiff covering the yacht "Courageous," described as an auxiliary schooner, which sank about eleven miles out of Nassau from an incursion of water and from fire on the morning of April 30, 1959.

The policy was issued on September 15, 1958, for the term of one year and was in effect on April 30, 1959. The amount of the coverage was $30,000. It was agreed between the plaintiff and the defendant in the policy that the "Courageous" had a value of $30,000. The policy [1] insured

---

1. "Perils. Touching the adventures and perils which the Company is contented to bear, and does take upon itself, they are, of the seas and waters * * * fire, * * * explosion. * * *"
"Negligence and Latent Defect. This insurance shall also cover * * * loss of

the vessel against the perils of the sea, fire, and explosion, and certain other risks not here involved.

In a memorandum submitted to the Court after trial the defendant maintains that the loss of the ship was not accidental, but was caused "by the fraudulent and intentional misconduct of the plaintiff in that the vessel was lost due to acts of omission and commission of the plaintiff consisting in part of neglecting to stop the incursion of water into the hull and to extinguish the fire." The defendant also maintains that the loss was not "due to a latent defect."

The defendant further contends that "even though it should be found that the incursion of water followed by fire was accidental in the first instance * * the plaintiff may not recover as provided by the policy, because the vessel was ultimately lost, in that such ultimate loss resulted from the want of due diligence on the part of the plaintiff (Owner, Master, and Assured) in deliberately failing to do what could and should have been done to protect and save the vessel from loss."

The "Courageous" was an attractive, two-masted schooner, sixty-two feet long with a draught of eight feet, and powered by sails and a 95-horsepower Chrysler marine engine. It was built in 1923. She had a wooden hull, three cabins, a galley, and slept nine persons. She was well maintained and cared for by the plaintiff. She was put in the shipyard for repairs at least once a year and had been given a general overhaul in the fall of 1958 at Norton's Ship Yard, Newport, Rhode Island. The ship was fully equipped for charter cruises. Her equipment included a costly ship-to-shore wireless telephone. In the event of trouble the ship could call a government telephone station at the docks or any vessel in the vicinity believed to be listening. There was no coast guard or similar agency at Nassau.

The hull was divided into six compartments. From bow to stern, the first was the chain locker; the second, crew quarters; the third was the galley; the fourth was the main cabin; the fifth was the aft stateroom; and the sixth was the lazarette. This last compartment could be entered only through an opening in the top deck. The engine, which was equipped with a flame arrester, was situated in the third compartment. Four large 8-volt batteries were located in the second compartment, and two 6-volt batteries in the third compartment. The gasoline tank, having a capacity of 120 gallons, was situated in the sixth compartment. There were four fire extinguishers placed respectively in the first, third, fourth, and fifth compartments.

The ship was equipped with three pumps. A small hand pump was located in the sixth compartment. Another small pump with a one-inch pipeline was attached to the engine. The plaintiff described it as being really a valve. He had never used it because in his opinion its use would foul up and probably stall the engine. The third was a large, manually operated pump four inches in diameter, affixed to the top deck two or three feet away from the stairway leading to the main cabin and about fifteen feet forward of the steering wheel.

The plaintiff, who was the master as well as the owner of the "Courageous," was a forty-three-year-old man with considerable experience in sailing vessels. He learned to sail small boats in Portsmouth, New Hampshire, about 1940. He subsequently owned and sailed a thirty-two-foot sloop. From about 1946 to 1949 he was employed as a boat builder and pilot for a shipyard in Newburyport, Massachusetts. Thereafter until 1955 he was employed as captain successively of a fifty-six-foot ketch, of a two-masted schooner, fifty-two feet long, used as a private yacht and for charter cruises, and of another two-masted schooner, sixty-

---

or damage to the Hull or Machinery directly caused by the following:

" * * * any latent defect in the machinery or hull * * *;

"Provided such loss or damage has not resulted from want of due diligence by the owners, or any of them, or by the manager or by the Assured."

five- or sixty-seven-feet long, which was used exclusively for charter cruises. He sailed the waters off the coast of New England in the summer and the waters of Florida, Haiti, Jamaica, and the Bahamas in the winter.

In the summer of 1955 he decided to go into the charter business on his own, and in September of the same year he purchased the "Courageous" with money borrowed from the Newport National Bank, Newport, Rhode Island, and from his friend and bookkeeper, Mrs. Harden. The bank loan was in the amount of $9,-500 and was secured by a first mortgage on the vessel. A loan of $5,600 from Mrs. Harden was secured by a second mortgage. The "Courageous" was repaired, painted, cleaned up, and made ready for sea.

From that time until April 30, 1959, the plaintiff engaged in the business of taking charter parties for cruises in the Bahamas in the winter and off the New England coast in the summer.

In the latter part of March 1959 the plaintiff sailed the "Courageous" from Nassau to Miami to take on a charter party. While in Miami he hired a young man named Clyburn as a deck hand or mate. Clyburn had experience on powered, small fishing boats. They had never met before. The mate's duties on the "Courageous" were to keep her clean and to assist the plaintiff in sailing her.

About April 1, 1959, the plaintiff and Clyburn and a charter party of two couples left Miami for Nassau on the "Courageous." After reaching Nassau and having some repairs made to the engine, they cruised the Bahamas for approximately three weeks and a half until about April 27, when the charter party was concluded. The "Courageous" then put in at Nassau and was tied up at the dock of the East Bay Service, Ltd., preparatory to sailing for Miami to pick up another charter party. It remained at the same dock until the morning of April 30, 1959, when it left for Miami.

The distance between Nassau and Miami is about 180 miles. The "Coura-geous" normally covered the distance in thirty hours and used about 135 gallons of gasoline.

The vessel was made shipshape and sufficient gasoline, oil, and food was taken on for the trip.

Clyburn testified at the trial. He was then married and no longer employed by the plaintiff. He slept on the boat the night before her departure. He had access to every part of the "Courageous." There was no compartment that was kept locked or that Clyburn could not enter. At no time did the plaintiff tell Clyburn to stay out of any part of the ship. On the morning of April 30 Clyburn had breakfast on board the "Courageous." The plaintiff had breakfast with a Captain Norton on the yacht "Empress." He returned to the "Courageous" about nine o'clock. He inspected the bilges and noticed nothing unusual in the amount of water there.

In starting the engine, the carburetor flooded. The plaintiff, assisted by Clyburn, removed it, cleaned it, and put it back again. Some of the gasoline overflowed into the ship. Emulsifier or detergent was used to emulsify the bilge water. The hatches were then opened, the blower turned on, and the ship vented to clear the fumes out of the bilges.

Before putting off to sea the plaintiff asked Clyburn if he would go with him on charters up north and offered to raise his pay to $50 a week. Clyburn told him he would.

They proceeded to sea sometime between 9 and 9:30 a. m. The weather was fair and the waters were quiet. There being insufficient wind, the ship was not under sail. The entrance to the harbor is about two and a half miles from the dock and is marked by a sea buoy and a lighthouse. After the ship passed beyond the entrance, Clyburn began to pump the bilges, using the large pump on the top deck about fifteen feet forward of the wheel. After pumping for twenty to thirty minutes, the time usually required to perform this routine chore, the pump began to "suck air," indicating that all

excess water had been removed. The "Courageous" had now been at sea about an hour.

Clyburn then stopped pumping and at the plaintiff's request relieved him at the wheel. The plaintiff, who was not feeling well, remained on deck to get some fresh air. At approximately 10:45 a. m. the plaintiff called Captain Norton by pre-arrangement to test Norton's radio. On this call the plaintiff informed Norton that he was not feeling well and might turn back to Nassau. Soon after the call an excessive amount of water was discovered coming into the ship. The plaintiff directed Clyburn to man the pump. Clyburn pumped as vigorously as he could. The plaintiff went below to search for the source of the water but was unable to find it. It appeared to be coming from the forward part of the ship. He ordered Clyburn to come about and head back for Nassau. He then called Captain Norton and informed him that he was heading back for Nassau, that they were taking water and that he did not know where it was coming from. He asked him for help. Norton told him to keep coming and that he would find a pump and get help for him, and that he would come out himself. The time of this call was about 11:15 a. m. The plaintiff returned to the deck and helped Clyburn work the main pump. The ship was equipped with a worm gear and the wheel could be left unattended for short periods and the ship would stay pretty much on course. While they were working the deck pump they heard a "puffing" sound as though a large quantity of air was being expelled. The plaintiff exclaimed, "What was that?" The muffled explosion was not immediately followed by smoke or fire.

The plaintiff went down once more into the cabin and there discovered smoke and flames. He seized the fire extinquisher on the wall of the main cabin, but when he saw the flames coming towards him he dropped it, ran on deck, and directed Clyburn to get the dinghy ready for launching. The dinghy was lashed to the deck for sea travel and contained miscellaneous equipment and gear and three 5-gallon containers filled with gasoline.

After clearing the dinghy, Clyburn resumed pumping until it became necessary to leave the ship.

When the fire broke out the "Courageous" was about eleven and a half miles away from the dock and about nine miles away from the entrance to the harbor.

The plaintiff never attempted to use the small pump attached to the engine. He testified that he was trying to bring the boat back to Nassau or to beach her, and that using the pump might foul up and stall the engine.

Not long after 11:15 a. m. they unlashed the dinghy, threw the equipment into it, including flares and life jackets, and launched it. When they had moved fifty to seventy-five feet away from the "Courageous" the plaintiff sent up three flares to signal a ship that was within a mile away from them and going out of Nassau. The flares can be seen in the daytime. There was no response from the ship. It kept on going. The "Courageous" was now enveloped in flames and they had to move farther away for fear the gasoline tank might explode. One of the two bottles of butane gas on the top deck did explode and sky-rocketed above the mast.

A large Navy ship anchored in the harbor became aware of what was happening and sent a helicopter to assist them. About a half hour after they had left the vessel a speedboat arrived on the scene with three men and a gasoline-powered water pump from the shipyard in Nassau. The "Courageous" was burning so badly that they could not get near her. They were then about eleven and a half miles from the dock from which they had sailed.

Captain Norton's yacht, the "Empress," which was much slower than the speedboat, arrived a half hour later. The plaintiff and Clyburn were taken aboard the "Empress" from the speedboat. Members of the crew wrapped the plaintiff in a big coat and gave him some

pills. They told him to lie down, but he could not.

The "Courageous" went down about an hour later. The depth of the ocean where she sank is about twelve hundred fathoms.

The dinghy, which was salvaged, had a value of $200.

It is undisputed that the defendant was heavily in debt at the time of the sinking. He owed a total of $17,866.93 to fourteen creditors. Of that sum, $12,-917.30 was the amount due on the first and second mortgages on the "Courageous." The remaining $4,949.93 was owed to the other twelve creditors in amounts ranging from $28.96 to $1,529. The payments on the first mortgage were current. The balance on October 11, 1958, was $8,781. By April 30, 1959, it had been reduced to $7,317.30. A payment of $500 on the first mortgage was made on April 8, 1959. Norton's Ship Yard bill had been reduced from $1,680.90 on October 10, 1958, to $651.45 by April 30, 1959. On March 17, 1959, the plaintiff paid another creditor $600 on account.

Mr. Roberts, of the East Bay Service, Ltd., which was owed a balance of $487.-20 on April 30, 1959, on a running account that was opened in 1955, had told the plaintiff that he intended to libel the ship unless the balance was paid. Mrs. Harden, holder of the second mortgage on the ship, a friend and bookkeeper of the plaintiff, had talked with Roberts and assured him that the plaintiff was coming back and would take care of the bill. The plaintiff knew that Mrs. Harden had spoken to Roberts. On April 21, 1959, the plaintiff paid East Bay Service $100 on account. The "Courageous" was tied up at East Bay Service's dock for several days prior to her departure on the morning of April 30, 1959, and the gasoline needed for the trip to Miami had been purchased at the dock. If, as the defendant contends, Roberts intended to libel the vessel for the unpaid balance, he had ample opportunity to do so while it was docked. There is no evidence, however, that he took any steps to libel the ship during that period. There is evidence tending to prove that he knew that the "Courageous" was taking on a full supply of fuel.

The second mortgage of $5,600 had not been reduced from its inception. Mrs. Harden, however, had never asked the plaintiff for any payments and was in no way pressing him. Gulf Oil Corporation, which was owed $423.84, wrote the plaintiff letters in February and March, 1959, requesting payment, and again on April 9, 1959, requesting the return of its credit card. These letters were addressed to the plaintiff's New Hampshire address while he was in Nassau and they did not come to his attention until after April 30, 1959. Except as noted in the cases of East Bay Service and Gulf Oil, there was no evidence that any creditor was pressing the plaintiff for payment before his departure from Nassau on April 30.

In 1958 the plaintiff's net profit from charter cruises for the entire year was $3,748, while for the first four months of 1959 his net profit was $3,196.

During the first four months of 1959 the plaintiff received about seventeen requests for charters that he could not fill because he was booked solid. He had accepted reservations for three charters for the last week of July and the first three weeks of August, 1959, for $2,200. He received nineteen inquiries for other charters in the summer of 1959. He was soliciting charters in April 1959. He received letters of inquiry concerning charters for the winter of 1959–1960. He was advertising for charters in a yachting magazine in April 1959. I find that as of April 30, 1959, when he left Nassau for Miami, the plaintiff intended to continue to engage in the business of running charter cruises.

The loss of an insured vessel in seaworthy condition in good weather and in calm waters from unknown causes may arouse suspicion. The fact that the owner and master of the ship is heavily indebted at the time of the loss may add to the suspicion. But suspicion, even strong.

suspicion, is not an acceptable substitute for proof by a preponderance of the evidence.

The plaintiff and Clyburn were extensively examined and cross-examined. The plaintiff was under searching cross-examination by defendant's counsel for perhaps the greater part of the four-day trial. Such differences as were developed in their testimony were of a kind that is normally to be expected when two witnesses engaged in varying tasks attempt to remember and to reconstruct in detail and in chronological sequence what happened and what was said and done before and during an unexpected emergency that placed their lives in danger. The order and the manner in which the questions are put often make the task of the witness more difficult.

On all the evidence I am not persuaded that the plaintiff scuttled or attempted to scuttle the "Courageous." The fire was not of incendiary origin. Nor am I persuaded that the loss of the "Courageous" was caused by any fraudulent or intentional act or omission on the part of the plaintiff.

The cause of the incursion of water into the ship is unknown. The cause of the fire is also unknown. It is undisputed that the loss of the "Courageous" resulted from the incursion of sea water and the supervening fire.

The defendant argues that the plaintiff failed to exercise due diligence "in neglecting to use the two auxiliary bilge pumps available to him to withstand the incursion of water," and "in that he made no effort to extinguish the fire."

As soon as the plaintiff discovered the accumulation of water in the main cabin, he radioed Captain Norton for help and then joined Clyburn in the operation of the large pump. Very soon thereafter the explosion occurred, followed by smoke and flames. Under these circumstances it would be unreasonable to hold, even in retrospect, that either the plaintiff or Clyburn should have abandoned other activity and climbed into the sixth compartment to work the small hand pump.

It further appears from the evidence that this pump was designed to remove water from the sixth compartment only.

The failure of the plaintiff to use the one-inch pump attached to the engine was justified by his fear that its operation might foul up and stall the engine in view of his plan to make port or to beach the vessel before she was overwhelmed by the inflow of water. In any event, the incursion of water was so massive that the operation of the two small pumps would have made no appreciable difference in preventing the accumulation of water before fire supervened. I find no causal connection between the loss of the ship and the failure to use the two small pumps. The "Courageous" was still afloat when the speedboat arrived with the power pump requested by the plaintiff. She did not sink until more than an hour later. It was the fire that prevented the use of the power pump on the "Courageous."

The plaintiff did make an attempt to use a fire extinquisher but was prevented by the advancing flames. In the circumstances he had no rational alternative than to retreat and start preparations to abandon ship.

In the emergency that arose the plaintiff did all that an experienced captain could reasonably be expected to do to save the ship. The loss of the "Courageous" did not result in whole or in part from want of due diligence by the plaintiff.

I find that the "Courageous" was seaworthy when she left Nassau for Miami on the morning of April 30, 1959.

■■ The applicable rules of law are to be found in Boston Insurance Co. v. Dehydrating Process Co., 1 Cir., 1953, 204 F.2d 441. It was there stated (page 443):

"Undoubtedly the libelant as the owner of the barge and its cargo has the burden of establishing by a balance of the probabilities that its loss was caused by a risk insured against, specifically in this case by a peril of the sea, for that is the only in-

sured risk relied upon as the cause of the loss. But this does not mean that in every case an insured in the position of the libelant in the case at bar must point out the precise peril of the sea which caused the loss. It appears to be well settled in Great Britain and also in the United States, indeed the parties agree, that when a vessel sinks at a sheltered berth in calm weather without any obvious explanation, such as overloading or improper stowage of cargo, or collision, settling with the tide on a rock or other underwater obstruction, lightning, fire, explosion of cargo or other casualty, a presumption arises that the incursion of sea water which caused the sinking, and hence the loss, was due to the unseaworthiness of the vessel in some particular. But it appears to be equally well settled, and the parties also agree, that an insured can rebut the foregoing presumption by establishing that in fact the vessel concerned was seaworthy before the sinking, and was neither overloaded nor improperly loaded, and if he succeeds in doing so, the counter-presumption arises that the unexplained sinking and consequent loss was caused by some extraordinary, although unknown and unascertainable, peril of the sea."

Substantially the same rules were applied in Mattson v. Connecticut Fire Ins. Co., D.C.Minn., 1948, 80 F.Supp. 101.

Since the "Courageous" was seaworthy when she sailed from Nassau and was not misused or improperly handled, the counter-presumption arises that her loss was caused by some extraordinary, although unknown and unascertainable, peril of the sea. The counter-presumption was not rebutted by the evidence.

■ I find that the loss of the "Courageous" was caused by a peril of the sea and by fire, both being risks covered by the policy.

In accordance with the provisions of the policy, the defendant is liable in the amount of $29,800, representing the face amount of the policy less the value of the dinghy.

The policy contains an endorsement which makes it payable, in case of loss, to the plaintiff, the Newport National Bank, first mortgagee, and Mrs. June A. Harden, second mortgagee, as their interests may appear. Neither mortgagee was made a party to this action. Accordingly, entry of judgment will be deferred, and the plaintiff and the defendant shall have twenty days within which they may propose appropriate action by the Court to protect the interests of the mortgagees in the proceeds of the judgment.