The **NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY**, Plaintiff,

v.

**Harry Oliver LINARD, an Underwriter at Lloyd's;  Edinburgh Assurance Co., Ltd., et al., Defendants.**

**No. 69 Civ. 5067.**

United States District Court,
S. D. New York.

June 4, 1973.

See also, D.C., 57 F.R.D. 552.

Haight, Gardner, Poor & Havens, New York City, for plaintiff; Emil A. Kratovil, Jr., New York City, of counsel.

Levin, Kreis, Ruskin & Gyory, New York City, for defendant and cross-claimant Vainqueur Corp.; Richard Gyory, Robert R. Kreis, New York City, of counsel.

Symmers, Fish & Warner, New York City, for defendants Underwriters at Lloyd's and Companies, The Travelers Indemnity Co. and Utica Mutual Ins. Co; William G. Symmers, Richard Webber, New York City, of counsel.

David A. Ticktin, New York City, for defendant Stuyvesant Ins. Co.; William G. Symmers, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

On the night of March 14, 1969 there was an explosion aboard the motor vessel Vainqueur ("Vainqueur") while the vessel was in the Gulf of Mexico en route from Vera Cruz to New Orleans with a cargo of sugar. The vessel suffered rapid flooding and within one hour it sank beyond salvageable depths. This action, arising from the above incident, was originally commenced by the Northwestern Mutual Life Insurance Company ("Northwestern"), as mortgagee of the Vainqueur, against Vainqueur Corporation, the mortgagor of the Vainqueur, and Auxiliary Power Corporation ("Auxiliary"), the guarantor of a promissory note for which the mortgage on the Vainqueur was security. Northwestern, as loss payee of certain insurance policies, also sued the remaining defendants the insurers who subscribed to policies of hull and machinery insurance with respect to the Vainqueur.[1] Vainqueur Corporation cross-claimed against the Underwriters for the face amount of the hull and machinery policies less the amount the Corporation owed to Northwestern. A default judgment was entered against Auxiliary in favor of Northwestern on December 18, 1970.

Prior to trial, Northwestern's claim against the Underwriters was settled. Pursuant to the settlement Northwestern assigned its rights under the mortgage, promissory note, and default judgment to Underwriters, and released them from further liability to Northwestern. Thus, the action proceeded to trial with cross-claimant Vainqueur Corporation, in effect the "plaintiff" and Underwriters the "defendant".

Vainqueur Corporation contends that the cause of the explosion which resulted in the sinking of the Vainqueur was unknown and therefore an event covered by the machinery and hull insurance policies. Underwriters, however, rejected the insurance claims, and contend that the vessel was purposefully scuttled by her owners by detonating an explosive device placed in one of the wing tanks of the vessel.

As additional defenses, Underwriters contend that Vainqueur Corporation, or its agents, concealed or misrepresented facts material to the risk, thereby precluding the insured from recovering under the policies. These defenses and their underlying facts need not be discussed since the Court has found that Vainqueur Corporation has not established that the loss of the Vainqueur was due to a peril covered by the insurance policies.

### I

A. Vainqueur Corporation is a Liberian company and the Vainqueur flew the Liberian flag. The vessel, displacing approximately 22,500 tons, was built in 1957 and 1958 in Montreal, Canada

---

1. Hereinafter, "Underwriters" refers to all defendants except the Vainqueur Corporation and Auxiliary Power Corporation.

The ship was powered by an 8-cylinder, 2-cycle main propulsion diesel engine. Additional power was provided by two generators, each driven by a diesel engine.

In 1967, the Vainqueur Corporation contracted to purchase the Vainqueur from a subsidiary of Northwestern. On January 23, 1968, the vessel was sold to Vainqueur Corporation for $412,500 in cash and a 7% promissory note in the amount of $1,287,500, signed by Vainqueur Corporation, guaranteed by Auxiliary, and secured by a Liberian preferred ship mortgage. The Corporation continued previously carried machine and hull insurance in the amount of $3,750,000. This insurance, subscribed to by Underwriters, was in force at the time of the sinking of the vessel. Although the Vainqueur Corporation paid a portion of the annual premium on the insurance four days before the sinking, pursuant to the policies the balance of annual premiums became immediately due upon the loss of the ship. These premiums were paid by Northwestern to Underwriters on March 19, 1969.

At the time of the Vainqueur's loss, the vessel was operating under a bulk sugar charter which provided for two voyages from Vera Cruz to New Orleans. 20,000 long tons of sugar were to be transported on each voyage. The vessel was lost on the second voyage.

With respect to the cause of the sinking of the Vainqueur, the parties agree only that an explosion was heard throughout the ship at about 11:40 P.M. on the night of March 14, 1969, in the vicinity of the engine room, which caused extensive flooding. The ship sank within one hour. Vainqueur Corporation asserts that the explosion was of unknown origin. It alleges, however, that the probable cause was either a starboard generator or main engine crankcase explosion which, combined with structural failure, created a hole in the vessel's hull sufficiently large to allow a massive influx of water. Vainqueur Corporation asserts that this loss was a risk insured by the insurance policies.

Underwriters concede,

"That a fortuitous explosion of unknown cause not resulting from any act of omission or commission on the part of the owners or managers of the vessel is an 'accident' within the meaning of the American Hull Insurance Syndicate Liner and Negligence Clause in the policies. . . ."

Nevertheless, Underwriters contend that no "fortuitous explosion of unknown cause" occurred. Rather, the loss of the vessel resulted from the detonation of an explosive device placed in a starboard wing tank. According to Underwriters, this device was placed with the "procurement" and "connivance" of the Vainqueur Corporation. Thus, Underwriters contend the sinking was not an insured event under the policies of marine insurance.

B. At trial, Vainqueur Corporation opened its case by offering in evidence the policies of insurance. The Corporation also presented evidence of due diligence in keeping the Vainqueur seaworthy.[2] Underwriters then introduced evidence with regard to the scuttling of the ship.

Auxiliary was the managing agent for the Vainqueur. It was an affiliate of Vainqueur Corporation and of Kervin Shipping Corporation, later Kervin Ship Agencies ("Kervin"), with offices in New York. Raoul Slavin was the principal in both Auxiliary and Kervin, and held a power of attorney for his mother who held the stock of the Vainqueur Corporation. While Slavin was associated with Kervin the Corporation suffered a series of constructive total losses of its vessels which led to large insurance recoveries.[3]

---

2. Little, if any, proof was offered by each side on the issue of unseaworthiness although the defense was never formally waived by Underwriters. In view of the Court's conclusions, this issue need not be discussed.

3. These constructive total losses included the M/V Hermano (hurricane damage, 1959), the M/T Mark Slavin (flooded engine room, 1963) and the S/S Christian S (fire in engine room, 1963).

During Vainqueur Corporation's ownership of the Vainqueur, the vessel experienced difficulties. A main engine breakdown occurred in 1968 and required new parts and repairs. In December of 1968, the port generator broke down near Honolulu. In early 1969, after the Vainqueur had arrived at New Orleans with her first sugar cargo, a longshoremans' strike prevented her from immediately discharging her sugar cargo. While waiting to discharge the cargo, the Vainqueur broke her anchor chain and collided with three other vessels. Minor damage was sustained and temporary repairs were made. These repairs were surveyed and approved by representatives of Lloyd's Register of Shipping. The damage appears to have had no relationship to the subsequent sinking.

Marius Pieterse, who was employed by Vainqueur Corporation as a Port Captain, joined the vessel in New Orleans after the collision occurred. Vainqueur Corporation contends that he joined the ship in connection with her personnel, maintenance and repair problems. Underwriters assert that he joined the ship for the purpose of placing an explosive charge aboard her. They argue that Pieterse was not a marine engineer and had no experience with diesel engines. He was therefore of little value with respect to necessary repairs on the port generator. In addition, Underwriters point out that there was no credible evidence that Pieterse discussed or was interested in personnel problems, and the collision damage had been temporarily repaired before the vessel departed on her last voyage. During that voyage, however, Pieterse did engage in inspections of certain of the vessel's wing tanks.

Pieterse had been discharged as Captain of a vessel in 1966 by her owners for loading his own cargo for profit against company orders. From that time on he worked in various capacities for Slavin companies. Apparently the relationship between Pieterse and Slavin was close. The telephone in Slavin's New York apartment is listed in Pieterse's name.

Underwriters introduced certain circumstantial evidence at trial concerning Pieterse's actions prior to and after the explosion which they contend demonstrates that Pieterse deliberately detonated an explosive device aboard the Vainqueur. They assert that the evidence demonstrates that the explosion "probably" occurred in the No. 6 starboard wing tank of the vessel, and that on March 14, Pieterse had entered that tank and was "preoccupied" with it. Pieterse was also allegedly interested on the night of the sinking in the precise location of the Vainqueur and the depth of the water. Assuming the truth of these facts, they alone do not establish that the vessel was scuttled. There was no credible evidence that Pieterse purchased explosives, nor was there evidence that he had possession of explosives at any time during the final voyage.

Underwriters also produced Gail D. Monroe, of Houston, Texas. She was a friend of Elaine Schaat, the wife-to-be of Pieterse, and apparently, acted as a "marriage counselor" to Pieterse and Miss Schaat. Pieterse made telephone calls to Mrs. Monroe from New Orleans and from Vera Cruz before the Vainqueur's last voyage. Mrs. Monroe testified that during the course of a call from New Orleans Pieterse told her that "they were going to make him blow up the Vainqueur and that he planned to do this and . . . that it would be done between New Orleans and Vera Cruz."[4] On a subsequent call from Vera Cruz before the sinking, Mrs. Monroe testified that Pieterse again told her that "they were going to make him do it," and

> that he had to set a device whereby the ship would blow up and blow up in such a way as to penetrate the especially heavy iron plates, double iron plates that are used in the Vainqueur,

4. Trial transcript, pages 1904–05.

and to do this so that he could get the crew where they wouldn't be hurt, send a radio message, and then try to get the whole crew off the ship.

And he mentioned that this had to be done in the deepest water.[5]

Finally, Mrs. Monroe testified that while at dinner with Pieterse in Houston after the sinking he told her that he had $75,000 to $85,000 coming to him as "his portion of the Vainqueur."[6]

When Pieterse testified at trial he denied the incriminating statements attributed to him. He explained that when aggravated he had said only, "what do you want me to do, you want me to blow up the Goddamn ships?"[7] He had made the remarks because he "couldn't get it through . . . their heads that (he) had to do a job, that (he) had many responsibilities. . . ."[8]

Vainqueur Corporation also argues that Mrs. Monroe's testimony was not credible and points out some discrepancies in her testimony during her deposition and at trial. Primarily these are related to the dates of the alleged remarks made by Pieterse.

Counsel for both sides originally planned to introduce the depositions of Mrs. Monroe and Pieterse, but not to call either of them to testify at trial. It soon became apparent to the Court that observing the "live" testimony of these witnesses might be crucial to the decision of the case. The Court indicated this to counsel and both Pieterse and Mrs. Monroe were called as witnesses. Nevertheless, the live testimony of these witnesses did not resolve the issues. Both appeared credible, and were good witnesses. Although Mrs. Monroe would appear to have no reason to lie and to subject herself to perjury penalties, while Pieterse might lie to further the alleged conspiracy, the Court cannot find on the basis of the testimony of Mrs. Monroe that the Vainqueur was purposefully scuttled.

A final instance of hearsay testimony offered by Underwriters also cast suspicion on the cause of the sinking. During the launching of a lifeboat the Chief Officer heard the Chief Engineer say, "I know the son of a bitch who did this."[9]

C. A major portion of the trial was devoted to the testimony of experts who advanced various theories to explain the loss of the Vainqueur. To further their contention that the Vainqueur sank because of the detonation of an explosive device in the No. 6 starboard wing tank Underwriters called Dr. Walter M. MacLean who is head of the Department of Engineering at the United States Merchant Marine Academy. Dr. MacLean was well qualified in marine architecture and engineering having spent most of his life at various institutions in teaching and research. The gist of his testimony was that an explosive device placed in the wing tank as suggested by Underwriters would sink the vessel,[10] but that a starboard generator engine crankcase explosion or main engine crankcase explosion, combined with structural failure, which is the explanation proposed by Vainqueur Corporation, could not sink the ship. Dr. MacLean reached the latter conclusion by assuming that after such an explosion the engine room, steering gear flat and dry stores area would become flooded. Nevertheless, the Vainqueur would have been expected to remain afloat although trimmed heavily to the stern under these conditions.

Vainqueur Corporation's main expert was Henry M. Tiedemann. He advanced theories of how a crankcase explosion

---

5. *Id.* at 1905.

6. *Id.* at 1913.

7. Deposition of Marius Pieterse, exh. v-81, p. 67.

8. *Id.* at 162.

9. Trial transcript, page 930.

10. There was conflicting testimony by other experts as to how many pounds of explosives would be needed to blow a hole in the skin of the vessel in order to sink it and how difficult this task would be. Most of this testimony appeared to the Court to be pure speculation.

could sink the Vainqueur. A minor crankcase explosion could have caused a secondary explosion in the main engine lube oil sump tank. Furthermore, a "massive rupture" could have developed across the No. 6 starboard wing tank thereby flooding it, resulting in the loss of the vessel.

Each expert sought to contradict the theories of his counterpart. It appeared to the Court that both experts set forth viable theories for the sinking. More interesting was the uncontradicted testimony of Dr. MacLean that there were no known instances of the loss of a merchant vessel as a result of a diesel engine crankcase explosion. The Court concludes, however, that neither expert could, with any degree of scientific certainty, determine the cause of the sinking of the Vainqueur.

D. Underwriters contend that there was "ample motive" for Raoul Slavin to sink the Vainqueur to collect the insurance proceeds. Apparently, Mr. Slavin was in financial trouble.[11] Proof was offered that he was experiencing difficulty in meeting the mortgage payments on the Vainqueur and requested several extensions from Northwestern. In addition, the Vainqueur was experiencing difficulties in contracting freight charters and freight rates were very low. Finally, the Vainqueur Corporation had little cash available for payment of the insurance premiums and had taken out bank loans. Underwriters assert that the evidence showed that the Vainqueur was a financial liability which added to Slavin's financial woes.

Underwriters offered evidence that in early March, 1969, the value of the Vainqueur was $1,530,000, while the hull insurance policies were for the total sum of $3,750,000. The unpaid principal on the Northwestern mortgage was close to $1,100,000. Thus, Underwriters argue that the sinking of the Vainqueur would result in the payment of the mortgage from insurance proceeds, the recoupment of the investment in the Vainqueur, the loss of a burdensome shipping venture, and a "windfall 'profit' ".

Furthermore, Underwriters point out that Pieterse had no personal motive to sink the Vainqueur against the wishes of her owners. Rather, Underwriters reason that only one having a financial motive would arrange for the scuttling of the vessel. Underwriters offered little direct evidence in support of these assertions, but argue that the "inevitable inference from the circumstantial evidence of the case" compels such a conclusion.

Vainqueur Corporation rebutted the evidence of financial motive by arguing that Slavin was not the owner of the Vainqueur, but that his mother was; that the Vainqueur had two charters lined up for the future; that Underwriters' accountant witness did not consider the accounts receivable of Vainqueur Corporation;[12] and that Underwriters had agreed to and desired the continuation of the insurance value of $3,750,000 for the vessel.

E. The Court has reviewed all of the evidence and concludes that the circumstantial evidence of deliberate scuttling is insufficient to establish by a preponderance of the evidence[13] that the Vainqueur was scuttled. This does not, however, dispose of the case. The evidence of scuttling is sufficient to satisfy Underwriters' burden of producing

---

11. In another proceeding, Slavin stated that his financial position was "desperate and sinking". Slavin v. Slavin, Index No. 9533168 Supreme Court, Westchester County.

12. Vainqueur Corporation adhered to the position that insurance claims pending should have been listed in the accounts receivable but were ignored by Underwriters' accountant witness.

13. A "preponderance of the evidence" is sufficient to establish criminal conduct as a defense in a civil action. United States v. Regan, 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914); People v. Briggs, 114 N.Y. 56, 65, 20 N.E. 820 (1889); see also the discussion of the presumption of innocence, *infra*.

evidence.[14] In effect, the evidence of scuttling is in balance or equipoise. Thus, it becomes crucial which party has the burden of persuasion that the loss was an insured event.

## II

A. The Court has jurisdiction of this maritime contract action pursuant to the provisions of 28 U.S.C. § 1333. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 313, 75 S.Ct. 368, 99 L.Ed. 337 (1954). Jurisdiction is uncontested.

B. There are no choice of law difficulties. British and American Underwriters issued the policies herein to a Liberian corporation with New York offices. The Vainqueur was operated by Auxiliary, a New York corporation, out of its office in New York. Under these circumstances, New York law arguably would govern the policies. See Navegacion Goya v. Mutual B & M Insurance Co., 1972 A.M.C. 650, 653 (S.D.N.Y. 1972).[15]

Nevertheless, the same principles of marine insurance law govern under both state and federal law with regard to the issues in this action. Thus, no conflict exists. These principles are also in accord with numerous English cases dealing with burden of proof in scuttling cases and they will be applied here.[16]

■ C. Generally, the burden of proof in an action on marine insurance to show that a loss arose from a peril covered by the policy is on the plaintiff. Felicione & Sons Fish Company v. Citizens Casualty Company, 430 F.2d 136,

138 (5th Cir. 1970), cert. denied 401 U. S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); Steam Tanker Padre Island v. London Assurance, Guildhall Insurance Co., 1970 A.M.C. 600, 613 (S.D.Texas 1969); Cary v. The Home Insurance Co., 235 N.Y. 296, 299, 139 N.E. 274 (1923); Fine v. American Eagle Fire Insurance Co., 178 Misc. 27, 32 N.Y.S.2d 21 (City Ct., Queens County 1941), aff'd without op. 180 Misc. 789, 46 N.Y.S.2d 512 (2d Dep't 1943). English courts have considered the rule in relation to their cases involving "casting away".[17]

In Astrovlanis Compania Naviera, S. A. v. Linard, (The "Gold Sky"), 2 Ll.L. Rep. 187 (Q.B.1972), the plaintiffs claimed a total loss of their vessel by perils of the sea. The Underwriters refused to pay the claim. The Court considered the burden of proof issue as follows:

> Short of the House of Lords there is no doubt about the law as to the burden of proof in an action in which, as here, the plaintiff claims a total loss of his ship by perils of the seas, whilst the Underwriter defendant puts the plaintiff to proof of this and further alleges scuttling. *Id.* at 192.

The Court then cited with approval the following language from Compania Naviera Vascongada v. British & Foreign Marine Insurance Co., Ltd. ("The Gloria"), 54 Ll.L.Rep. 35, 50 (1936):

> . . . The onus of proof that the loss was fortuitous lies upon the plaintiffs, but that does not mean that they will fail if their evidence does not exclude all reasonable possibility that

14. "Substantial evidence" is sufficient to satisfy the burden of producing evidence. McCormick, Evidence, § 338 (2d Ed. 1972). See also the discussion of the burden of producing evidence, *infra*.

15. See also, Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), where the Court said that state law should be applied in the field of marine insurance where "entrenched federal precedent is lacking" with respect to a specific issue.

16. "The courts of the United States, notably the Supreme Court, have expressly announced and followed a policy of deference to the English decisions in the field, recognizing not only the longer experience of those courts but also the great desirability of uniformity, given the close connections of the American and British insurance markets." G. Gilmore, C. Black, Jr., The Law of Admiralty, at page 51 (1957) (footnote omitted).

17. "Casting away" is the British term for, and is synonymous with, scuttling.

the ship was scuttled. Before that possibility is considered some evidence in support of it must be forthcoming. Scuttling is a crime, and the Court will not find that it has been committed unless it is proved with the same degree of certainty as is required for the proof of a crime. If, however, the evidence is such that the Court, giving full weight to the consideration that scuttling is a crime, is not satisfied that the ship was scuttled, but finds that the probability that she was is equal to the probability that her loss was fortuitous, the plaintiffs will fail.

In Compania Naviera Santi, S. A. v. Indemnity Marine Assurance Company (The "Tropaioforos"), 2 Ll.L.Rep. 469 (Q.B.1961), the Court advanced the following reasoning for the above approach:

> No doubt one reason for placing the burden of proof on the shipowners . . . is that they are likely to have all, or almost all, the relevant information, and the insurers are likely to have virtually no information initially. The insurers, for their proof of scuttling, or their suggestion that there is a strong ground for thinking that there may have been scuttling, have to rely on such information as they can obtain from discovery of documents and from cross-examination of ship's witnesses called by plaintiffs. *Id.* at 473.

Vainqueur Corporation asserts that neither the owners nor the insurers have access to any facts as to the cause of the sinking and the loss of the Vainqueur cannot be proven in a "scientific" sense. The Corporation reasons further that since the determination of the cause of the explosion is highly theoretical, the insurance coverage is illusory if "the burden" is placed upon the shipowner.

The simple answer to these arguments is that Vainqueur Corporation ignores the distinction between burden of producing evidence and burden of

persuasion, the two obligations which comprise the notion of "burden of proof". See McCormick, Evidence, § 336 (2d Ed. 1972); R. Dworkin, Easy Cases, Bad Law, and Burdens of Proof, 25 Vand.L.Rev. 1151, 1153 (1972). The burden of producing evidence requires the burdened party to present sufficient evidence to permit the trier of fact to find for him on the issue in question. This is a question of law. The burden of persuasion requires the burdened party to persuade the trier of fact to find for him on the issue. The party who has the burden of persuasion in a civil action usually must prove his case by a preponderance of the evidence. The burden of producing evidence may shift from party to party as the case progresses. On the other hand, the burden of persuasion remains on one side throughout the litigation.[18]

Applied here, these concepts clarify the duties of the parties and rebut Vainqueur Corporation's assertions. As noted previously, the burden of persuading the trier of fact that a loss is within the insurance coverage is generally on the plaintiff. The English courts apply this rule in the scuttling cases. This Court, following the general rule and the English cases, places the burden of persuasion on Vainqueur Corporation. Nevertheless, the burden of producing evidence, also originally on Vainqueur Corporation, was met by it by offering the insurance policies and evidence of an explosion of unknown cause. At this point Vainqueur Corporation had made out its *prima facie* case. The burden of producing evidence then shifted to Underwriters. It became their obligation to come forward with evidence of intentional scuttling of the Vainqueur, otherwise they would have lost the case. This evidence was produced.

Thus, despite the fact that the ultimate burden of persuasion is on the insured, marine insurance coverage is

---

18. For an exhaustive discussion of this distinction, see, J. Thayer, A Preliminary Treatise on Evidence at the Common Law, 354 (1898).

certainly not illusory for that reason, as Vainqueur Corporation argues. Underwriters had the obligation to produce evidence of scuttling before Vainqueur Corporation could lose the case. Although, as the Court has discussed, the evidence produced by Underwriters was not sufficient for the Court to find by a preponderance of the evidence that the Vainqueur was scuttled, the evidence was sufficient to meet Underwriters' burden of producing evidence. Stated again, although Vainqueur Corporation has the ultimate burden of persuasion, Underwriters could not prevail unless they produced evidence of scuttling sufficient to meet their burden of producing evidence; evidence which tended to show that the explosion was not within the insurance coverage.

The reasoning above is not unlike that in another English case, La Compania Martiartu v. The Corporation of the Royal Exchange Assurance, 1 K.B. 650, 655, 657 (C.A.1923), aff'd 16 Aspinall's Maritime Law Cases, 395 (H.L.1924), where the Court stated:

> If the assured makes out a prima facie case . . . then unless the Underwriters displace that prima facie case the assured is no doubt entitled to rely upon the presumption. On the other hand, if the prima facie case . . . fails because the Underwriters put forward a reasonable explanation of the loss, the superstructure falls with it. If both the assured and the Underwriters put forward an explanation of the loss, the loss is not unexplained in a sense which would admit of the presumption, merely because the Court is unable to say which of the two explanations is the correct one. . . . I find it impossible to say that the (insured has) established to my satisfaction that the loss of the vessel was due to a peril covered by the policy.

> .     .     .     .     .     .

The presumption may well be, when nothing is known except that the ship has disappeared at sea, that her loss was by perils of the sea. . . . But when, though it is known she has sunk, there is evidence on each side as to the cause of the admission of sea water, which leaves the Court in doubt whether the effective cause is within or without the policy, the plaintiff, the assured, fails, for he has not proved a loss by perils insured against. . . .

D. Vainqueur Corporation cites Boston Ins. Co. v. Dehydrating Process Co., 204 F.2d 441 (1st Cir. 1953), for the proposition that the owner of the vessel is not required to negative all possible inferences or locate the precise cause when his vessel sinks. *Boston* considered whether the loss of cargo and damage to a vessel were caused by perils of the sea. The Court discussed two presumptions: when a vessel sinks in calm weather it is presumed unseaworthy; and when it is established by its owners that a vessel is seaworthy, a counter presumption arises that the unexplained sinking was caused by an unknown, but insured against, peril of the sea.[19]

Wenhold v. Royal Insurance Co., 197 F.Supp. 75 (D.Mass.1961) applied these presumptions where a vessel was insured against explosions and there were allegations of scuttling. There, before the insured sixty-two foot schooner sunk, it began taking in an excessive amount of water, followed by a "puffing" sound which was characterized as a "muffled explosion". Id. at 78. The Court stated that the counter presumption, that the loss was by a peril of the sea, was not rebutted.

*Wenhold* is distinguishable on the facts. First, the "explosion" there apparently was a result of the flooding of the vessel, rather than the opposite. The Court's decision did not hinge on the cause of the explosion and the insur-

---

19. *Boston*, however, did not involve allegations of scuttling and the Court found that the barge in question was not unseaworthy.

ers did not offer proof that the explosion was purposely detonated. Furthermore, the Court in *Wenhold* found that a related fire which led to the abandoning of the vessel "was not of incendiary origin," and that the vessel "was not misused or improperly handled." *Id.* at 80, 81. Thus, it appears that on the facts the Court had ruled out scuttling. Only then did the presumption arise that the loss was by peril of the sea. On the evidence here, no finding could be made that the Vainqueur was not scuttled. Thus, no presumption should arise.[20]

■ E. Vainqueur Corporation points out that the presumption that a person is innocent of a crime applies in a civil proceeding. British America Assur. Co. of Toronto v. Bowen, 134 F.2d 256 (10th Cir. 1943). Nevertheless, the presumption only requires the party who asserts that a crime was committed to assume the burden of producing evidence on that issue. In *Bowen,* the Court indicated that when some evidence is introduced to overcome the presump-

tion it disappears. *Id.* at 259, of 134 F. 2d. Moreover, here the most that was determined as to whether the Vainqueur was scuttled was the Court's negative finding that the owner had not sustained its burden of proving that the explosion was an insured event. This is far from the opposite holding that the vessel was scuttled. The Court did not make such a finding as the proof was not sufficient to support such a finding.[21]

■ F. Vainqueur Corporation also argues that even assuming that there was sufficient evidence that Pieterse detonated explosives, there was insufficient evidence that Vainqueur Corporation was a principal or co-conspirator.[22] The Court finds that there was sufficient evidence of the owner's role in the sinking to meet Underwriters' burden of producing evidence on the issue. The Court has already discussed the evidence of motive, and the testimony of Gail Monroe. Add to these considerations the comments of the court in La Compania Martiartu v. Royal Exchange As-

---

20. Even assuming that a *Wenhold* presumption should arise here, Underwriters have rebutted it with substantial evidence. Once the presumption is rebutted it disappears. See generally, Employers' Liability Assurance Corp. v. Maes, 235 F.2d 918, 921 (10th Cir. 1956); Fleming v. Ponziani, 24 N.Y.2d 105, 111, 299 N.Y.S.2d 134, 247 N.E.2d 114 (1969); People v. Richetti, 302 N.Y. 290, 298, 97 N.E.2d 908 (1951); 9 Wigmore, Evidence, § 2491(2). The general rule as stated in both *Wenhold* and *Boston* then applies:

Undoubtedly the libelant as the owner of the barge and its cargo has the burden of establishing by a balance of the probabilities that its loss was caused by a risk insured against, specifically in this case by a peril of the sea, for that is the only insured risk relied upon as the cause of the loss. 197 F.Supp. at 80, 81.

The burden of persuasion, which remained on Vainqueur Corporation is unaffected.

This Court does not adopt the view that a presumption of seaworthiness changes the burden of persuasion. Rather, the presumption, if applied here, merely

shifts the burden of producing evidence. See McCormick, Evidence, § 345 (2d Ed. 1972), 5 Moore's Federal Practice § 43.08, at p. 1362 n. 19 and cases cited therein. To the extent that the proposed Federal Rules of Evidence, § 301, might change the above, suffice it to say that these rules are not and may not become effective. In addition, it is doubtful whether § 301 would apply here, see § 302 of the Proposed Rules.

Thus, even with the aid of a presumption of loss by perils of the sea, because of the evidence submitted by Underwriters, the presumption has disappeared, leaving the burden of persuasion on Vainqueur Corporation. The Corporation simply has not met that burden.

21. See also the English cases cited and quoted earlier on the application of the criminal presumptions in scuttling cases, and the discussion on presumptions generally, in footnote 20, *supra.*

22. If Vainqueur Corporation was not involved in the purposeful explosion they would be entitled to recover because barratry is insured against under the policies.

surance Co., 16 Aspinall's Maritime Law Cases 395 (H.L.1924):

> The captain in particular had no pecuniary interest in adopting a course so little likely to advance his professional reputation. It is not suggested that they had any quarrel with, or cherished any spite against, the owners. They were comparatively small men, with a relatively small interest in the venture. The owners, on the other hand, had a gigantic interest in the scuttling. The loss of the vessel at that particular moment meant indeed the difference to the company between solvency and insolvency. When once the fact of deliberate scuttling is established, the probability which remains to be balanced is as to whether such scuttling took place with or without the privity of the owners.
>
> .    .    .    .    .    .
>
> All the members of the Court of Appeal, . . . treat it as obvious, beyond any need of argument, that, if the ship was scuttled, the owners were privy to it, and for my part I do not believe a jury could have been found to decide otherwise.
>
> Ships are not cast away out of lightness of heart or sheer animal spirits. There must be some strong motive at work, and this is usually the hope of gain. In the present case there was no operative motive to lead the engineer and captain to sink the ship on their own account. *Id.* at 397, 398.

G. Finally, the Court notes that this decision is not contrary to the general rule of insurance that an insurer has the burden of proving such facts as will come within an exclusionary clause in an insurance contract. Prashker v. United States Guar. Co., 1 N.Y.2d 584, 592, 154 N.Y.S.2d 910, 136 N.E.2d 871 (1956). The Court has not determined that the insured must show that no exclusionary clause applies; rather, the insured must demonstrate only that the event comes within the insurance policy. If Vainqueur Corporation had met that burden, Underwriters would have been liable to the Corporation unless Underwriters proved that an exclusionary clause applied.

H. In summation, the Court concludes the following:

1. Vainqueur Corporation had the burden of persuasion throughout this proceeding on the issue of whether the explosion was an insured event.

2. Vainqueur Corporation also initially had the burden of producing evidence. Vainqueur Corporation met this burden (making out its prima facie case) and shifted the burden of producing evidence to Underwriters.

3. If the Underwriters had offered no proof of scuttling, Vainqueur Corporation would have been entitled to a judgment.

4. Underwriters offered substantial evidence of scuttling, sufficient to meet their burden of producing evidence. At this point, this burden disappeared from the case.

5. Underwriters' evidence of scuttling was sufficient to rebut a presumption that the loss was by a peril of the sea. Underwriters produced substantial evidence that the loss was by scuttling, not by a peril of the sea or an explosion within policy coverage.

6. Although the proof was not sufficient for the Court to find that the Vainqueur was scuttled, since Vainqueur Corporation had the ultimate burden of persuading the Court that the loss was an insured event within the policy, and since the Corporation failed to meet its burden, its cross-claim against Underwriters must be dismissed.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed. R.Civ.P.

Settle judgment on notice.